IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 25, 2003

## STATE OF TENNESSEE v. REX A. GIBSON

**Direct Appeal from the Circuit Court for Sevier County**
**No. 8457     Rex Henry Ogle, Judge**

---

**No. E2002-01533-CCA-R3-CD**
**September 9, 2003**

---

A  Sevier County jury convicted the Defendant of driving under the influence and failure to carry a driver's license.  The trial court sentenced him to ninety days of incarceration, followed by supervised probation, and suspended his license for two years.  He now appeals, claiming: (1) that the trial court erred in failing to suppress all evidence gained as a result of his traffic stop; and (2) that the trial court erred by admitting into evidence the results of his breathalyzer test.  In the event that this Court finds that either the traffic stop was unconstitutional or the breathalyzer test was inadmissable, then, the Defendant contends, the remaining evidence is insufficient to support his conviction.  Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Keith E. Haas, Sevierville, Tennessee, for the appellant, Rex A. Gibson.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

On the evening of July 15, 2000, Chris Melacon was returning to Pigeon Forge from a trip to Gatlinburg by way of a two-lane bypass.  While on the bypass, the Defendant, Rex A. Gibson, who was driving a gold Jaguar, quickly approached Melacon from behind and attempted to pass him in the oncoming traffic lane.  An oncoming vehicle forced the Defendant back into Melacon's lane, requiring Melacon to slam on his breaks in order to avoid being hit and forcing the oncoming vehicle to run off of the road.  The Defendant then pulled in front of Melacon, at which time Melacon obtained the license plate number of the Defendant's vehicle before the Defendant drove off at a high

rate of speed. Melacon's wife, a passenger in the car, immediately contacted the Pigeon Forge police and provided a description of the Jaguar and the car's license plate number.

The Pigeon Forge Police Department issued a dispatch, including a vehicle description and the tag number, to alert officers of a vehicle driving erratically on the bypass entering Pigeon Forge. Officer Tim Culotta, a motorcycle officer with the Pigeon Forge Police Department, received this dispatch and parked at a restaurant a quarter of a mile inside the city limits, where he could observe all traffic exiting the bypass. Officer Culotta testified that, shortly thereafter, he witnessed a gold-colored Jaguar exit the bypass "traveling a pretty good speed, faster than all the other vehicles" and weaving in and out of traffic without using signals. Believing the driving was reckless, the officer pulled behind the Defendant, verified the tag number as the one received over the dispatch, and then stopped the Defendant.

Officer Culotta approached the Defendant's vehicle and requested to see his driver's license. The Defendant explained that his license was probably suspended, and while the Defendant was explaining this, the officer noticed the smell of alcohol on his breath. When asked whether he had been drinking, the Defendant stated he had been drinking Irish coffee, a mixture of coffee and liquor. Officer Culotta then asked the Defendant to step out of the vehicle and perform several field sobriety tests. Culotta testified at trial that the Defendant performed poorly on the tests; he specified that the defendant appeared to be unsteady and to stagger at times during the tests. From this, Officer Culotta determined that the Defendant had been driving while impaired by alcohol.

Just as Officer Culotta stopped the Defendant, Officer Randy Holbrook, who was also on patrol that evening, responded as backup and activated the video recorder in his patrol car. Officer Holbrook testified that he did not observe the field sobriety tests because he was taking a statement from Chris Melacon, who had stopped when he noticed that the Defendant had been pulled over. On cross-examination, Officer Holbrook admitted that he commented to Melacon that the officers needed a statement from him because "[they had] to have a reason to pull over this Jaguar," but he did not agree with defense counsel that he was seeking a reason to justify the stop. Rather, he testified that he knew the officers needed an independent reason to pull over the vehicle.

Officer Holbrook testified that he transported the Defendant to the police department. Upon arrival, the officer placed the Defendant in a chair approximately five to six feet away from him and observed the Defendant for a twenty-two minute period. During this period, the officer conversed with the talkative Defendant, checked to see if any foreign substances were in the Defendant's mouth, and asked if the Defendant would agree to take a breathalyzer test. The officer stated that the Defendant agreed to take the test and that he followed all proper procedures in administering the test to the Defendant. The officer further testified that he recalled not taking any calls or filling out paperwork during the twenty-two minute observation period. The officer explained that the test revealed a BAC of .11 percent.

After the conclusion of the State's proof, the Defendant testified on his own behalf. He explained that on the evening of July 15, 2000, he went to a Gatlinburg restaurant, where he

encountered an acquaintance named Norm Winkle. Winkle, who lived near the Defendant and who, according to the Defendant, "had a lot to drink," requested that the Defendant follow him home. The Defendant testified that he drank two Irish coffees while at the restaurant. He testified that, upon leaving, Winkle "took off" and that he "took off behind him." When he passed Chris Melacon on the bypass, he believed it to be a passing zone, but he stated that he had to "jump back in between cars" to avoid an approaching vehicle. The Defendant stated that he exited the bypass going into Pigeon Forge and ran into "backed-up" traffic. He denied passing cars or changing lanes but, rather, claimed that he was driving "regular[ly]." Shortly after arriving in the city, he noticed the officers traveling behind him, and, when they activated their blue lights, the Defendant pulled over.

The Defendant testified that he told the officers he had two "bad knees," but agreed to attempt to perform the field sobriety tests. Contrary to the testimony of Officer Holbrook, the Defendant stated that, upon arrival at the police station, he was placed in a holding cell, where he was allowed to use his cell phone, and remained there for fifteen minutes. The Defendant further testified that he had a lemon drop in his mouth prior to the breathalyzer test and that he had dental work in his mouth, which he was not asked to remove prior to the test.

## II. Analysis
### A. Suppression of Evidence

The Defendant challenges the trial court's denial of his motion to suppress the evidence obtained as a result of the traffic stop of his vehicle. The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

We begin our analysis with the Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 655 (1961), which provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Similarly, Article I, section 7 of the Tennessee Constitution provides:

people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and not to be granted.

Tenn. Const. art. I, § 7. It should be noted that both constitutional prohibitions against unreasonable searches and seizures are intended to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the [Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996); accord State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993).

Because the Defendant was temporarily detained when stopped by the officers, he was "seized" under the Fourth Amendment. See Whren, 517 U.S. at 809-10. Therefore, we must next seek to establish whether the stop complied with constitutional prohibitions against unreasonable searches and seizures. Under both federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence obtained from such a seizure should be suppressed unless the State demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to one of the narrowly-defined exceptions to the warrant requirement. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)). However, should the search or seizure fall into one of these narrow exceptions, the fruits of that search and seizure may be properly admitted into evidence. State v. Shaw, 603 S.W.2d 741, 743 (Tenn. Crim. App. 1980). One such exception is the "stop-and-frisk situation," Terry v. Ohio, 392 U.S. 1, 19 (1968), whereby an officer may make an investigatory stop when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed. Id.; State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992).

It is the Defendant's contention that the investigatory stop of his vehicle was unconstitutional because the officer lacked reasonable suspicion, supported by specific and articulable facts, to believe that the Defendant was violating the law; thus, the Defendant contends, all derivative evidence must be suppressed as the fruit of an illegal seizure. Initially, we must acknowledge the less demanding standard of "reasonable suspicion" as compared with "probable cause." Reasonable suspicion "can be established with information that is different in quantity or content than that required to establish probable cause [and] . . . can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990); see Yeargan, 958 S.W.2d at 632. In evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417 (1981); Watkins, 827 S.W.2d at 294. "This [may] include[], but is not limited to, objective observations, information obtained from other police officers or agencies, information

-4-

obtained from citizens, and the pattern of operation of certain offenders. Watkins, 827 S.W.2d at 294; see also Cortez, 449 U.S. at 418. Also, the court must consider "the rational inferences and deductions that a trained officer could draw from the facts and circumstances known to him." Watkins, 827 S.W.2d at 294; see Terry, 392 U.S. at 27 n.23.

Under this totality of the circumstances test, the Defendant has failed to meet his burden of showing that the evidence preponderates against the trial court's denial of the motion to suppress. At the pre-trial suppression hearing, the arresting officer, Officer Tim Culotta, the arresting officer, testified that he received a call from dispatch stating a gold Jaguar was driving erratically on the bypass entering Pigeon Forge from Gatlinburg. The call from dispatch included the tag number of the Jaguar. While the information provided to dispatch came from an anonymous caller, this is not per se insufficient to support reasonable suspicion. Instead, the anonymous tip must be analyzed by considering the informant's basis of knowledge and reliability and any corroborating circumstances known to the police. State v. Luke, 995 S.W.2d 630, 637 (Tenn. Crim. App. 1999). "When the informant reports an incident at or near the time of its occurrence, a court can often assume that the report is first-hand, and hence reliable." State v. Pulley, 863 S.W.2d 29, 32 (Tenn. 1993). Additionally, the ability to corroborate the license plate number, a detailed description of the vehicle, and the pinpointing of the location of the vehicle have been found as indications of reliability. See Luke, 995 S.W.2d at 638; Pulley, 863 S.W.2d at 32. The officer need not corroborate every detail, but he or she must corroborate more than a few minor aspects. Luke, 995 S.W.2d at 638. Officer Culotta was able to corroborate all three aforementioned indications. Placing himself where he could observe vehicles exiting the bypass, Culotta saw the vehicle, as described and where the informant said it should be, and was able to exactly match the license plate number. The officer testified that he was also able to witness the erratic driving that the informant had described, further corroborating the information provided to dispatch.

In addition to the reliability of the informant's tip, the content and, specifically, the level of danger that the tip reveals must be considered in determining the reasonableness of the stop. Pulley, 863 S.W.2d at 32. Officer Culotta did not know at the time he initiated the stop that the Defendant was legally intoxicated, but the erratic driving combined with the report from dispatch could lead an officer to rationally infer that the Defendant was impaired. The dangers posed by a driver under the influence of an intoxicant are well known and justify a stop where the officer has reasonable suspicion due, in part, to information received from an anonymous informant. We conclude that the information provided by the anonymous informant, when corroborated by the officer, provided sufficient grounds for reasonable suspicion and an investigative stop by Officer Culotta.

We note that Officer Culotta's investigatory stop meets constitutional muster on an additional ground, independent of our analysis of the informant's tip. Where the police have probable cause or reasonable suspicion to believe that a traffic violation has occurred, a stop of the automobile by the police is reasonable. Whren, 517 U.S. at 810; State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997). Officer Culotta testified at the preliminary hearing that he witnessed the Defendant weave in and out of traffic at an excessive speed without using the required turn signals. The Defendant questions Officer Culotta's credibility and contends that this driving was not possible given the

heavy traffic, as displayed on the videotape of the stop, which is included in the record. The Defendant further points to Officer Holbrook's comment on the video that the officers needed a statement from Chris Melacon to give them reason to pull the vehicle over as indication that Officer Culotta did not witness erratic driving. However, Officer Holbrook was not the arresting officer and was not present to see the erratic driving himself. It is reasonable to infer that his comments to Melacon were intended to gain additional evidence against the Defendant. Furthermore, we cannot say that the limited view of the camera that recorded the stop and the limited content of the videotape captured on film provide enough evidence, even when combined with Officer Holbrook's comments, to preponderate against the determination of the trial court. Providing the State with the "strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence," Odom, 928 S.W.2d at 23, we conclude that the officer's testimony regarding the Defendant's driving provided him with ample reasonable suspicion to conduct an investigative stop. For all of the foregoing reasons, we find that the investigative stop was proper and permissible, and the evidence gained from the stop was properly admitted at trial.

## B. Admissibility of Evidence

The Defendant contends that the results of his breathalyzer test taken at the police station should not have been admitted because the State failed to lay the proper foundation for the admission of such results. In order to establish a proper foundation for the admission of breathalyzer test results, six prerequisites must be met. State v. Sensing, 843 S.W.2d 412, 416 (Tenn. 1992). First, the officer must testify that the tests were performed in accordance with Tennessee Bureau of Investigation standards and operating procedures. Id. Second, the officer must be properly certified in accordance with those standards. Id. Third, the evidentiary breath-testing instrument must be certified, tested regularly for accuracy, and working properly at the time of the test. Id. Fourth, the motorist must be observed for a period of twenty minutes prior to testing to ensure that the motorist does not have foreign matter in his mouth, that he or she does not consume any alcoholic beverage, and that he or she does not smoke or regurgitate. Id. Fifth, the officer must testify that he followed the proscribed operational procedure. Id. Lastly, the officer must identify the printout record offered in evidence. Id. The State bears the burden of proving that the breath test complied with the requirements articulated in Sensing. State v. Korsakov, 34 S.W.3d 534, 539 (Tenn. Crim. App. 2000). On appeal, we presume that the trial court's determination regarding the Sensing requirements is correct unless the evidence preponderates otherwise. Id. at 540.

Specifically, in this case, the Defendant argues the State failed to meet its burden of proving the fourth Sensing requirement because the officer did not observe the Defendant continuously and without distraction for the required twenty-minute period. Only two days before the stop of the Defendant, this Court explained in Korsakov that an officer need not stare unblinkingly at the defendant, but may not perform other tasks while watching, thereby ensuring nothing occurred that would affect the validity of the test. See id. The Defendant implicitly argues that the new, stricter observation requirement would not have been known to the officer, and thus, we must assume that

he did not follow a comparable procedure. This line of argument focuses primarily on the credibility of the testing officer.

The State counters by arguing that the issue is waived for failure to make a timely objection. Consequently, we must turn to the record to determine if the required motions or objections were made. The Defendant requested, and the trial court held, a pretrial suppression hearing where testimony was offered pertaining to the legality of the investigatory stop. At that time, the Defendant raised no issue regarding the admissibility of the breathalyzer results or Officer Holbrook's testimony. The record on appeal is not entirely clear on this point, but the Defendant states that an oral pretrial motion in limine was granted pertaining to prior bad acts, convictions, and other matters. Included with this motion was a request that the State not mention the results of the breathalyzer until the proper foundation was laid. At the conclusion of the evidence presented at trial, the trial court, at the request of the Defendant, acknowledged that the motion was made, and the judge ruled that the breathalyzer results would be excluded if the foundation was not properly established. The Defendant objected twice during the State's opening statement when the results were mentioned but did not object at any time during Officer Holbrook's testimony regarding the breathalyzer test or its results. The Defendant did not renew his objection to the admissibility of the test results until after the jury was charged.

While a defendant is not required to challenge the admissibility of breathalyzer test results before trial by means of a motion to suppress, the Defendant may make a timely objection at trial if the State has failed to meet its burden in laying the proper foundation for admissibility. State v. Cook, 9 S.W.3d 98, 103 (Tenn. 1999). We conclude that the Defendant failed to make the required timely objection; thus, the issue is waived. By failing to object during the relevant portion of Officer Holbrook's testimony, the Defendant "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). "When a party does not object to the admissibility of evidence, . . . the evidence becomes admissible notwithstanding any other [r]ule of [e]vidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000) (quoting State v. Harrington, 627 S.W.2d 345, 348 (Tenn. 1981)). Where there is no contemporaneous objection to proffered evidence in a criminal prosecution, the evidence is competent, and any complaint about the admission of such evidence is waived. State v. Hooper, 695 S.W.2d 530, 536 (Tenn. Crim. App. 1985).

Nevertheless, we hold any error as to the admissibility of the test results at trial was harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). Examining the record, we find that all six of the prerequisites for laying a proper foundation are met. See Sensing, 843 S.W.2d at 416. The Defendant specifically challenges the fourth Sensing requirement, namely that a defendant must be observed for twenty minutes prior to testing. Id. However, as we have previously stated, the officer is not required to unblinkingly gaze at the defendant, but must be watching the defendant rather than performing other tasks. Korsakov, 34 S.W.3d at 540. This Court has held that the observation requirement is satisfied where the officer remains in very close proximity to the defendant for the entire observation period, engages him or her in conversation (which aids in determining if there is

foreign matter in the mouth), and loses direct eye contact for only brief intervals of time. See State v. Brad Stephen Luckett, No. M2000-00528-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 174, at *7-*8 (Tenn. Crim. App. Mar. 8, 2001). At trial, Officer Holbrook testified that he observed the Defendant for twenty-two minutes, sitting five to six feet away. The Officer stated that, during this time, he talked with the Defendant, in part, to check for foreign substances in the mouth. While the Defendant questions the credibility of Officer Holbrook, the trial court determined that the officer's testimony was credible, and properly laid the foundation to admit the breathalyzer test. This Court will uphold this finding of fact by the trial court unless the evidence preponderates otherwise. Odom, 928 S.W.2d at 23. Accordingly, we find that the evidence does not preponderate against the trial court's finding that the State met its burden in laying the proper foundation for the admissibility of the results.

The Defendant further argues that the trial court erred by allowing the State to discuss the breathalyzer results in its opening statement. The Defendant bases this argument on the pretrial, oral motion in limine requesting that the results not be mentioned until the proper foundation was laid. However, trial courts have wide discretion in controlling arguments of counsel, including opening statements, and a trial court's ruling concerning the arguments of counsel will not be reversed absent an abuse of discretion. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). A trial court should provide both parties the opportunity to present their case theory and the facts upon which they intend to rely, so long as those facts are deemed likely to be supported by admissible evidence. See State v. Stout, 46 S.W.3d 689, 713 (Tenn. 2001). Examining the record, we do not find an abuse of discretion by the trial court in allowing Counsel for the Defendant to refer to the breathalyzer test results in the opening statement.

In sum, we hold that the Defendant waived any issue regarding the admission into evidence of the breathalyzer test results at trial. Furthermore, we find that the trial court did not abuse its discretion by allowing the State to refer to the breathalyzer test results in opening statements. Finally, we conclude that any error with regard to the admission of the breathalyzer test results at trial was harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).


## C. Sufficiency of Evidence

Finally, the Defendant alleges that there is insufficient evidence in the record to support his conviction for driving under the influence. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas, 286 S.W.2d at 859. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant has failed to meet his burden of showing that the evidence was legally insufficient to convict him of driving under the influence. See id. The relevant statute at the time of the defendant's arrest, in pertinent part, made it "unlawful for any person to drive . . . any automobile . . . while . . . [t]he alcohol concentration in such person's blood or breath [was] ten-hundredths of one percent (.10%) or more." Tenn. Code Ann. § 55-10-401(a)(2) (2000). At trial, the State presented the testimony of Officer Culotta, who stated that he witnessed the Defendant driving recklessly, including speeding and weaving in and out of traffic. Culotta further testified that he noticed the smell of alcohol on the Defendant's breath and that the Defendant performed poorly on the field sobriety tests. The State next presented Officer Holbrook, who testified that the Defendant registered a BAC of .11 percent. Because we hold that the motion to suppress was properly denied and that the breathalyzer test results were properly admitted into evidence, we find that there was sufficient evidence for the jury to convict the Defendant of driving under the influence.

Accordingly, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE

-9-